# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs May 27, 2014

# IN RE: ALEXIS C.

**Appeal from the Juvenile Court for Greene County**
**No. J24963      Kenneth N. Bailey, Jr., Judge**

---

**No. E2013-02498-COA-R3-PT-FILED-JUNE 25, 2014**

---

Jessica C. ("Mother") and Jesse W. ("Father") appeal the termination of their parental rights to the minor child Alexis C. ("the Child"). We find and hold that clear and convincing evidence was shown that grounds existed to terminate Mother's and Father's parental rights to the Child for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv), and for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and Tenn. Code Ann. § 37-1-102, and that clear and convincing evidence was shown that the termination was in the Child's best interest. We, therefore, affirm the judgment of the Juvenile Court for Greene County ("the Juvenile Court") terminating Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Jessica C.

Dallas L. Blair, III, Greeneville, Tennessee, for the appellant, Jesse W.

Robert E. Cooper, Jr., Attorney General and Reporter; and Jordan Scott, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in January of 2013 drug exposed. At that time, both Mother and Father were incarcerated on charges of initiation of a process intended to result in the manufacture of methamphetamine. Mother admitted to using non-prescribed morphine, marijuana, and methamphetamine during the pregnancy. The Child was taken into State custody and was placed with a foster family upon being released from the hospital after her birth.

DCS filed a petition on March 8, 2013 seeking to terminate the parental rights of Mother and Father to the Child for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv), and for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and Tenn. Code Ann. § 37-1-102. The case was tried without a jury over two days in July of 2013 and October of 2013.

Rebecca McCurry, the nurse manager over obstetrics and the nursery at Laughlin Hospital, testified at trial. Nurse McCurry is a R.N. who works as a staff nurse in obstetrics and the nursery and oversees all of the other staff nurses on the unit. As a staff nurse, Nurse McCurry does assessments and treatments of mothers and babies including labor, delivery, postpartum, and newborns. Although Nurse McCurry did not provide care to the Child, she did review the Child's hospital records.

Nurse McCurry testified that the Child's hospital records reflect that the physician ordered a urine drug screen and a meconium drug screen. The results of the meconium screen were positive for morphine. Nurse McCurry testified that it is not normal to have morphine in meconium. She stated: "It's only in the meconium is [sic] the infant has been exposed to it." Nurse McCurry stated that in the absence of a prescription, morphine should not be seen in the meconium.

Nurse McCurry testified that the Child "was assessed for withdrawal symptoms through the NAS scoring. And the highest score, let me see, seven, seven is indicative of some sort of withdrawal." Nurse McCurry agreed that with a score of seven the Child was exhibiting signs that a child not exposed to drugs in utero would not be exhibiting. Nurse McCurry explained that a score of zero is normal and shows no signs of withdrawal. She stated: "A seven is, it is getting a little bit more elevated, but there's some sort of neural problem going on."

Nurse McCurry testified that Mother had tested positive for drug use during her pregnancy with the Child. Mother's hospital admission records show that Mother had a history of THC, opiate, and amphetamine use. Medical records show that Mother was on Suboxone, which was prescribed. A urine drug screen of Mother done on January 5, 2013 was positive for amphetamines, THC, and opiates. Nurse McCurry testified that a chart note from January 30, 2013 showed that the Child was receiving no medications and stated: "mother's incarceration [on January 5, 2013] may have detoxed the baby."

The Child was discharged from the hospital on February 2, 2013. Nurse McCurry testified that while in the hospital, the Child was checked for NAS scores "[e]very two to hour [sic] hours," and from the time of her birth, the Child scored a seven three times and scored several threes, several ones, and some zeros. Nurse McCurry was asked what score was desirable, and she stated: "A zero to three." On January 27, 2013 the Child had NAS scores of between four and seven, consistently above the ideal zero to three range.

Father, who was 34 years old at the time of trial, testified that he is the Child's father and that DNA testing has confirmed this fact. Father testified that he first found out that Mother was pregnant with the Child in July or August of 2012. Father has had no contact with the Child since the Child's birth.

Father was incarcerated on January 5, 2013 and still was incarcerated at the time of trial. Father was arrested for: "Initiation of a process to manufacture methamphetamines." Father testified that he was visiting a family member, and there was a meth lab in the front yard, and every one in the house was arrested. Father denied having knowledge about the meth lab, and stated that as far as he knew there was not any meth or any components of meth in the house. Father was asked if Mother ever accompanied him when he visited this family member, and he stated: "Sometimes, yes. She went most places with me unless I was at work. She even went to work with me on occasion."

Father also was charged with violation of probation for driving without a license and failure to appear. Father testified that the violation of probation was for incurring new charges and for "not having community service and not paying my fine, not having my fines paid." Father pled guilty to driving without a license and failure to appear. He explained that he pled guilty in October of 2012 to the offenses that had put him on probation. Father spent twelve days in jail for those offenses and then was released on probation.

Father testified that his arrest for the initiation charge was a class B offense but that the charge was reduced, and he pled guilty to a class D for buying Sudafed. Father was asked where he purchased Sudafed, and he stated: "Pharmacies, Food City Pharmacy on

Snapps Ferry." He testified he purchased Sudafed at that location once, but also admitted that he had purchased Sudafed other times at Walgreens. When questioned further, Father admitted that he also had purchased Sudafed in Missouri. Father was asked why he purchased the Sudafed, and he stated: "For, to trade for money. People asked me to buy it. I would buy it and resell it." Father admitted that he last had purchased Sudafed on January 1st or 2nd of 2013.

Father testified that he does not use meth. He was asked what drugs he does use, and he stated: "Pain pills. . . . Morphine." Father admitted that he would obtain morphine off the streets and would share it with Mother. Father admitted that he was splitting morphine pills with Mother while Mother was pregnant with the Child and that neither he nor Mother had a prescription for morphine. Father admitted that he had "done Roxys on occasion, oxycodone." Father admitted that he had been shooting up morphine for "[a] long time." He further admitted that he had been doing so since around the time he pled guilty in 2008 to possession of syringes. Father admitted that he had had five or more probation violations.

Father was asked if he ever sought help for his drug problem, and he stated:

I asked for Drug Court once and they set me a date to come back to Court and I was at the work house and they never brought me back to Court for it. And I was supposed to go to rehab but I didn't have the money to go to rehab.

Father did not attempt to get into rehab during the times when he was not incarcerated. He stated: "I've always been told they were several thousand dollars. I do good buying my cigarettes, let alone pay seven, ten thousand dollars." Father admitted that he was just relying on general knowledge and what he had heard regarding the cost of rehab.

Father was asked if when he was released from jail his drug problem would be fixed, and he stated: "No, I'm trying to get into a rehab now. I mean, I'm sober but once you get back out there they are all around you . . . . I am done hanging around with the crowd I was hanging around with. I haven't been running with the [sic] but . . . ." Father guessed that his expected release date would be January or February of 2014. Due to his sentence, Father has to go before the Parole Board as he is not subject to automatic release.

Father was asked how often he purchased the morphine that he and Mother shared, and he stated: "Once a day, once every other day." He was asked how much he was paying for it, and he stated: "Ten, twelve dollars." Father admitted that he knew that he should not be giving unprescribed morphine to Mother while she was pregnant, and further

admitted that he knew it was bad for the unborn baby.  Father was asked if he would do the same thing if it were possible to do it over, and he stated:

> My idea was to cut her off to begin with but Dr. Nelson, we went to the Suboxone clinic.  I couldn't afford that.  I made it one time and it cost two hundred dollars for every two weeks and there is no insurance that pays for it, you have to pay cash.  So I would have to save up my ten dollars until I got to $200.00 saved up and by then she would have been clean.  Dr. Nelson said, do not let the baby go through withdrawal, that would do more harm than good so I thought I was doing right.

Father admitted that Mother was on TennCare, but he denied ever contacting anyone at TennCare to try to get assistance with getting Suboxone.

Father admitted that he and Mother were strung out together before Mother became pregnant, and he stated: "We didn't just find out she was pregnant and say, oh, well, we'd like to get the baby strung out too."  Father was asked if anything really changed when Mother became pregnant, and he stated: "Yeah, I went from using, 300, 400 milligrams a day to 15 a day.  Yeah, there was a lot changed."  Father testified that he and Mother cut their dosage back, "[e]xtremely back, done everything but quit."

When asked, Father admitted that prior to cutting back to 15 milligrams a day and spending ten to twelve dollars, he had been spending fifty or sixty dollars a day on the drug.  Father was asked how he got the money, and he testified that he worked at the Village Square Restaurant.  Father admitted that he had been spending around three hundred and fifty dollars a week on morphine.  He was asked how he could afford to spend three hundred and fifty dollars a week on morphine but could not afford to spend two hundred dollars every two weeks on Suboxone, and he stated:

> Because when I come back from Missouri I had to go back to my aunt's restaurant making one hundred and thirty dollars a week.  And cigarettes and gas and all that, I barely.  If my dad wouldn't have let me live with him I would have been in a heck of a bind.

Father testified that he was working in Missouri refurbishing Coca Cola machines.  Father testified that he went to school through the tenth grade and that he had obtained his GED.

Father admitted that he smokes a pack or two of cigarettes a day, which he stated costs: "Thirteen dollars for a bag of tobacco a pound."  Father purchased a pound "[a]bout once every two weeks."  Father stated that he spends about ten dollars for the tubes

to roll the cigarettes in addition to the money he spends on the tobacco. Father admitted that Mother also smokes, and that they would spend approximately fifty dollars a week to purchase the supplies for both of their cigarettes.

Father testified that when he purchased Sudafed he traded it for the pills about ninety-five percent of the time, and five percent of the time he would sell it for twenty or thirty dollars a box. He stated that he sold one or two boxes a month. Father testified that he worked at the restaurant around fifteen hours a week, and stated that he was unable to obtain other employment because "[t]hey ain't hiring." Mother also worked at the restaurant as a waitress and made "[m]aybe sixty dollars per week, thirty dollars a day, forty dollars a day depending on how good her tips was." Father admitted that the two of them made around two hundred dollars a week from the restaurant. Father was asked what other expenses he had, and he stated: "I helped my dad pay the light bill. . . . And buying gas. . . . And cigarettes, yes. . . . I've bought some (INAUDIBLE) and stuff getting ready for the baby, but no major bills." Father testified that the light bill was around ninety dollars, and gas was eight or ten dollars a day.

Father denied supplying Mother with marijuana and stated: "I haven't had any dealings with marijuana since 2007, whenever it was [that he was charged with simple possession of schedule IV]." Father denied knowing that Mother still was using marijuana. He stated that the last time he knew she used marijuana was in July of 2012.

Officer Robert Livingston, Deputy Sheriff with the Greene County Sheriff's Department, testified at trial as an expert in meth identification and clean-up. Officer Livingston first became certified as a meth tech in 2005. His certification as a Tennessee Meth Task Force member entitles Officer Livingston "to be able to recognize and tear down any meth labs, . . . to be found in our county or region." Officer Livingston was asked how he recognizes a meth lab and he stated:

> Odors is one thing, chemical presence, the chemicals that are present in a residence or a camper or outside the residence as well as the presence of pseudoephedrine which is pseudoephedrine, you cannot make methamphetamine without Sudafed. No matter how hard you try you have to have Sudafed to make meth. That is one reason for the legislation going on now about the ephedrine.

Officer Livingston testified that he is familiar with both Father and Mother. He stated that "[r]elated to law enforcement work over to the years, their names have come up several times." Officer Livingston testified that he was dispatched to Peppermint Lane on January 5, 2013. He stated:

Upon arrival we were actually looking for a subject who had a felony warrant. We'd received permission to search the residence. As I was making my entrance to the residence, going up to the front steps of the house there was an active one-pot [meth lab] laying in the yard. As I approached the doorway to the residence there was a strong, very strong odor of ammonia about the residence. And at that time myself and Officer McDonald ordered everybody out of the house.

Officer Livingston explained that the strong odor of ammonia is "what it smells like when you cook meth."

When everyone was ordered out of the house, Father and Mother came out of the bathroom together. Officer Livingston stated that after they secured the site, they "did an initial walk-around of the outside of the residence and there was another one-pot in the back yard at the bathroom window." This was the same bathroom Father and Mother had exited.

Officer Livingston testified: "There were no one-pots inside the house. There was what was called a gasser was found inside the house." Officer Livingston explained what a gasser was and that it was a part of the meth lab. Officer Livingston explained about some of the dangers of making meth including the possibility of causing an explosion or burst of flames, which he described would be "like throwing gasolene on a fire." He also stated that the hydrogen chloride gas from the gasser can be fatal if inhaled. Officer Livingston testified in some detail about how the chemicals used in manufacturing meth can be harmful or dangerous in and of themselves.

Based upon the evidence including swabs for component chemicals done inside the house, Officer Livingston opined that there was an active meth lab inside the house. He stated that the evidence "tells me there has been a lab inside the house along with the strong odor of ammonia. I mean, it would literally take your breath inside the house. How these people were still inside, I have no idea."

Officer Livingston attempted to interview Father and Mother. He testified that Father refused to give an interview, but Mother gave a written statement after waiving her rights. Officer Livingston read into the record at trial Mother's written statement, which stated, in part:

The 3rd, James and [Father] were talking about making up some meth. One [sic] the 4th me and [Father] got dropped off and [sic] James' house at 8:00 p.m. when [Father] got off work. James already had [some of the components

-7-

of meth]. [Father] [had several of the other components of meth]. They started making it outside in the garage and finished it off inside the house in James' bedroom and then they did all of it. Then James and [Father] put more of the pills in the mixture and started making some more and that was done at 4:00 a.m. And I did like a half a quarter and [Father] and James done the rest. And then James and [Father] put all of the old mixtures together and got another pull off of it and then I don't [sic] a half a quarter again when it was done at like 6:00 a.m. and James and [Father] done the rest again. Then James and I walked down to the store to get him cigs and [Father] stayed at the house using the bathroom. And me and James got back, [Father] was still using the bathroom. James got what I think was a morphine 30 out of his room and said he'd be back in a minute and then the cops showed up and everything went down.

Officer Livingston witnessed Mother write out and sign her statement and sign the waiver of her rights.

Officer Livingston testified that Father and Mother pled to promotion of the manufacture of methamphetamine. Both Father and Mother had records of purchasing pseudoephedrine. Officer Livingston testified that the purchases of pseudoephedrine were:

not considered the smurfing law. . . . You have to buy enough to produce nine grams. There was not enough purchased by either individual, enough to produce nine grams as far as that being illegal. But it is a high purchase amount, especially on the dates prior to the lab, both purchases and in the same area.

With regard to a photograph depicting the one-pot found outside the bathroom window, Officer Livingston testified:

This is the one-pot bottle that is laying outside of the bathroom window, this being the bathroom window. You can see it laying right there, this bottle is busted. It was cold that day and the ground was dry but it was wet around the bottles which tells me that it was freshly thrown out. And you can see bits of ammonia nitrate around the bottle and it has busted as it hit the ground. No explosion occurred or fire occurred with that.

Mother, who was twenty-four years old at the time of trial, testified. Mother admitted that the Child had been born with drugs in her system. Mother further admitted that she had taken those drugs while she was pregnant with the Child. Mother admitted that she

took morphine, which she did not have a prescription for.  She also admitted to smoking marijuana during about six and a half months, or seven months of her pregnancy.  Mother admitted that she had smoked marijuana "[e]very day probably, almost, every other day."  Mother took Suboxone that was prescribed for her and admitted that she also took some that was not prescribed for her.  Mother obtained the unprescribed supply from a friend.  Mother agreed with Father's testimony regarding Mother smoking cigarettes.

Mother testified that she started using marijuana when she was 13 or 14 years old.  She started using Xanax when she was 18.  Mother testified that when she was around 20, she quit using Xanax and began using Roxys and morphine.  Mother then began using morphine, which she stated she has used since.  Mother admitted to smoking meth one or two times while she was pregnant.  Immediately after making this admission, Mother was asked how she used methamphetamine, and she stated: "Shot it."

Mother was on TennCare during her pregnancy.  Mother testified that TennCare covered the Suboxone but wouldn't cover the office visit, which cost two hundred dollars every two weeks.  Mother stated that she had to show up for the office visit each time before she could obtain the prescription.  When asked if there were areas where she and Father could have cut back on spending to obtain the two hundred dollars, Mother stated: "Probably."  Mother testified that she worked at Village Square and that she never looked for other employment to supplement her income so she could afford the two hundred dollars every two weeks.

Mother testified that she has seen Father do meth.  Mother testified that "what we mostly did was morphine, mainly."  Mother was taking morphine pills "[e]very day to every other day."  Mother testified that Father was getting the morphine pills for her, which were supposed to be taken orally, but that she was shooting them up.  Mother admitted that she has been shooting up morphine since 2009.  She stated that the morphine made her high and that Suboxone had the same effect.  Mother testified that she made the purchases of pseudoephedrine to sell them in exchange for morphine pills.

Mother testified that she did not know that smoking marijuana during her pregnancy could hurt the baby, but admitted that she knew that morphine would hurt the baby.  She stated: "But I knew quitting the morphine would make the baby go through withdrawals and my doctor told me not to do that. . . . Dr. Nelson told me to keep doing what I was doing as long as it was keeping the baby from going through withdrawals."  Mother stated: "I was supposed to get into the Suboxone clinic in Mosheim but I got arrested and I never made it that far."  Mother further testified she was going to the clinic in Johnson City and stated: "It was two hundred dollars there.  The one in Mosheim was one hundred dollars.  That's where I was supposed to be going but I got arrested.  I never made it there."

Mother did not dispute the written statement she had made, which Officer Livingston had read into the record. Mother testified that she did methamphetamine the day she was arrested, but stated that this was "the only time I did it in my pregnancy." Mother was asked why she waited until three weeks before the baby was due to smoke meth, and she stated: "I don't know. I seen everybody else getting high and I wanted to get high too, I guess." Mother admitted that she knew that meth would be bad for the baby.

Mother testified that her release eligibility would occur during July 2013, which is the same month when the first day of trial occurred. Mother was asked if she still had a drug problem, and she stated: "I don't know. I believe I could quit. I know I could quit. I've done it before," but admitted she has had no treatment. Mother was asked what she planned to do when she was released, and she stated: "go to work and straighten up and do right." Mother stated that she planned to live with Father's father. Mother admitted that this was where she was living when she was arrested, and that she had been living there for almost two years at that time.

Mother has a high school diploma and attended one semester of college. Mother testified that she has been told that she can have her job as a waitress at Village Square back when she is released. Mother was asked if she had the ability to change the friends she was hanging out with around the time she was arrested or whether she relied upon those friends, and she stated: "No, I don't need friends. No, I don't need friends."

Mother testified that she has taken some parenting classes in jail and has had an alcohol and drug assessment. Mother was asked what she learned in the parenting classes, and she stated: "It was about how to treat your kid. To hold them when they are crying and stuff, their emotions. . . . And their behavioral stuff. I got the book at my thing. I'm still reading it."

Mother admitted that she has had two probation violations, but stated this is the first time she has been incarcerated. Mother was eight months pregnant when she was arrested. She admitted that by that time she had heard the baby's heart beat on an ultrasound and had seen the baby's movement. Mother was asked if these images crossed her mind when she began using the meth, and she stated: "Yes. I thought about it but then I just kind of blocked it out I guess at the time." Mother admitted that she decided that her high was more important than the Child at that point.

Mother stated that she and Father quit using drugs for a while. She stated:

When I first found out I was pregnant we quit. It wasn't long, we didn't quit for long. It was like a month or so. Then we started hanging out with people

again and we started back. Then we cut back because Dr. Nelson said that if I just quit cold turkey the baby would go through withdrawals and it could damage the baby somehow. He didn't explain how but he said it could damage the baby possibly. . . . So I didn't quit cold turkey I tried to wean myself down.

Kristina Adams, a Child Protective Services investigator for DCS, testified that she did an investigation on the Child's case. After the Child was born, Ms. Adams visited Mother in jail, and Ms. Adams stated:

We talked about her pregnancy. We talked about her drug use during pregnancy. We went over family members. She had told me that she knew that the baby would test positive for drugs at birth because she used drugs during pregnancy. She told me that she found out that she was pregnant at ten and a half weeks. She saw Dr. Nelson. Dr. Nelson referred her to Dr. Tino for Suboxone. She said she was on Suboxone for two weeks to a month and she couldn't afford the doctor's visits. TennCare paid for the actual Suboxone but not the doctor's visits. So she couldn't afford to remain on the Suboxone. She did tell me from the time she found out about the pregnancy until about five months pregnant she didn't use drugs because she knew that the drugs would harm the baby. But at about five, five and a half months she began to use morphine daily. She would use 15 to 20 milligrams of morphine daily. The longest she ever went during a period of time during her pregnancy from five, five and a half months would have been two days. She told me that on January 5th, 2013, [Father] and [Mr. K] were making meth in [Mr. K's] bedroom at the home. And she knew they were making meth. She could smell the chemicals coming from the bedroom. On that day she shot up fifteen to twenty milligrams of morphine and shot up the same amount of methamphetamine. On that same day law enforcement came to the home and discovered the meth lab. They were taken to Laughlin Memorial to be decontaminated. She was drug screened there then she was incarcerated.

Ms. Adams further testified that Mother told her that Mother and Father used methamphetamine together. Ms. Adams testified that DCS reviewed family members to try to find a placement for the Child within the family, and after investigating were unable to place the Child with any family members.

The trial was continued from July to October and during the second day of trial, in October, Holly Dean, a family services worker with DCS, testified. Ms. Dean worked on the Child's case. Mother was released during the time Ms. Dean was on maternity leave,

which was from July through September of 2013. Ms. Dean testified that Mother has called her two or three times to see how the Child is doing, but has not visited or had any contact with the Child since the Child entered State custody. The Child has been in her current foster placement for eight months, ever since she came into State custody.

Ms. Dean visits the Child twice a month and at least one of those times is in the foster home. Ms. Dean stated that the foster home: "is very clean and she sleeps in a crib. The home is very safe. And when I am there to observe [the Child] in the home the foster parents are playing with her and it doesn't even seem like I'm there. They are just so focused on her and interacting with her."

The foster parents have two biological children. Ms. Dean stated that the foster family "interact like a normal family may. They play games, they talk to each other, they do family outings." Ms. Dean testified that there is a bond between the Child and the foster parents. Ms. Dean believes that it is in the Child's best interest for Mother's and Father's parental rights to be terminated. Ms. Dean testified that the foster parents wish to adopt the Child if she becomes available for adoption.

Ms. Dean testified that Mother has been living with Father's father since her release from jail. Father still was incarcerated. Ms. Dean testified that Mother and Father have no relationship with the Child. Ms. Dean believes that a change in caretakers would be detrimental to the Child.

Dagney W. is the Child's foster mother ("Foster Mom"). Foster Mom is a social worker with Mountain States Health Alliance, Johnson City Medical Center. She has a Master's degree in social work. Foster Mom testified that the Child has been in her home since the Child was seven days old and has remained there continuously since that time. The Child was a normal newborn when she entered the foster home and does not have any issues or special needs that the foster parents are aware of.

Foster Mom testified that her household consists of her, her husband, their two children, who are eleven and eight years old, and the Child. Foster Mom testified that her husband is a pastor in Greeneville. Foster Mom explained that the Child goes to daycare during the day while the foster parents work, and then her husband picks the Child up around 3 p.m. with the other children.

Foster Mom testified that they have formed a bond with the Child. Foster Mom testified: "It's no different in my opinion than the children, my biological children. We feed her and clothe her and love her and hug her and get up in the middle of the night and rock her back asleep." Foster Mom was asked what types of things they do as a family, and she

stated: "Take walks, go to church, she sits with us when we play games. Normal family stuff, obviously she's too little to do the stuff the bigger kids do but she goes to their soccer games and band concerts and that kind of stuff. She is with us wherever we go."

Neither Mother nor Father have ever contacted the foster parents about the Child. Foster Mom testified that neither Mother nor Father has ever offered any type of support for the Child. Foster Mom testified that she and her husband want to adopt the Child if the Child becomes available for adoption.

Scott W. ("Foster Dad") also testified that they have formed a bond with the Child. He stated that the Child has integrated well into their household. Foster Dad testified that he and his wife want to adopt the Child if she becomes available for adoption.

After trial, the Juvenile Court entered a detailed and thorough Order Terminating Parental Rights and Awarding Full Guardianship on October 18, 2013 terminating Mother's and Father's parental rights to the Child after finding and holding, *inter alia*:

From the testimony of witnesses, the exhibits entered into evidence, and the record as a whole, the Court finds and so rules that the State has proven by clear and convincing evidence the following facts:

1.     The Court finds that by clear and convincing evidence that the Department has met its burden as to showing severe child abuse in this case.

2.     The mother used methamphetamine on January the 5th, 2013 and this child was born three weeks later.

3.     The mother also testified that she smoked marijuana almost daily during her pregnancy and that she and the father of the child also shot up morphine during the pregnancy.

4.     The Court finds that those actions exposed this child to abuse during the pregnancy.

5.     When the child was born its meconium tested positive.

6.     The mother also purchased Sudafed three times on January 3rd, 2013, a mere three weeks before this child was born. She also purchased it in October and November of 2012.

-13-

7.     Sudafed is the main ingredient of methamphetamine.

8.     The father admitted that he had been shooting up morphine since 2008, that he used morphine with the mother while she was pregnant and has also used "Roxys" and "Oxys" during the past.

9.     The father was making methamphetamine in the house when he and the mother were there three weeks before the baby was born.  His house could have very easily blown up since the making of methamphetamine can cause an explosion.

10.     The father also smoked methamphetamine with [Mother] on the day that he was arrested in early January 2013.

11.     The testimony and the Exhibits show that [Father] purchased Sudafed every month from April 2012 until January 2013.

12.     The entire time that the mother was pregnant the father was purchasing Sudafed, the key ingredient of methamphetamine.

13.     The father also admitted he supplied [Mother] with morphine during her pregnancy.  [Father] testified that he did that because the Subutex [sic] was too expensive and so the parents sort of tried to self-medicate by using only half of a pill, (they would share it).  The father also testified that he was smoking cigarettes at the time and spending two hundred dollars a month on that.

14.     The Court does credit [Father] in that the Court believes [Father] felt like he was doing the right thing, but he was not.  [Father] was assisting his pregnant wife in her drug addiction and exposing the child to drugs.

15.     The nurse from the hospital testified that the child did exhibit some withdrawal symptoms when it was born and the NAS score was a seven which was indicative of some sort of withdrawal.

16.     The Court does find that the Department met its burden as to both parents, that they exposed the child to severe abuse by the use of drugs.

17.     The Court finds that both parents showed wanton disregard for this child by their almost daily use of drugs.

18. The Court relies upon the same factors as previously found in this Order in finding that Wanton Disregard exists. The Department met its burden by clear and convincing evidence as to Wanton Disregard.

19. That given the history by the parents the Court thinks it would be at least six months to 18 months before the parents would be able to show to the Court that they have a clean history and be able to raise this child. At that point this child would be a year and a half to two and a half years old and the Court cannot put this child's life on hold. The Court cannot stop this child from developing and growing and trying to bond with others until the parents get their act together.

20. The Court does terminate the rights of [Father] and [Mother].

21. As to the best interest prong the Court finds that the Department has shown by clear and convincing evidence that it would be in the best interest of this child that the parents' rights be terminated.

22. The Court believes that it would be at least six months to 18 months before the parents would be able to show a history that they are clean and sober and be able to raise this child.

23. The Court notes that the drug and alcohol assessment for [Mother] referenced a long history of a drug culture in her childhood and adulthood. That was very concerning to the Court. That was introduced as an Exhibit. [Mother's] answers on the drug and alcohol assessment reflected a long time exposure to drug abuse as a way of life both in her adult life and childhood. The assessment also recommended that she seek intensive outpatient treatment. That she had a level of awareness important for successful treatment which is a positive, but she had been exposed to a culture of drug abuse for a long time which could make it difficult for her to see her pattern of usage, meaning the assessor was concerned that [Mother] does not fully understand the effect of her usage.

24. The testimony by [Mother] was that she smoked marijuana primarily from age 13 to 16 then she eventually began using Roxys and morphine and eventually started using methamphetamine. And that is very concerning, really from that age of 13 until 24, for nine years she had been using drugs.

25. The Court finds that the Department has met its burden for the best interest.

26. The Court has no doubt that [the great-grandmother] loves this child. This is her great-grandchild.

27. The Department, under the statute is to make an attempt for kinship placement. That does not always happen.

28. The Court has to weigh the options for this child: a two parent placement, a foster home where both parents are working, one is a social worker and one is a pastor versus a single great-grandmother of this child who already has two children in the home.

29. The Court again has no doubt that the great-grandmother loves this child.

30. That as for the best interest looking forward in this child's life and the fact that really this child genetically is going to have some addiction markers in the future because of both of the parents being addicts and using while this child was born, whatever home this child grows up in, which the Court thinks the [foster parents] will pursue an adoption after this, that home is going to have to be very mindful that there is a great chance that if this child starts using drugs in the future that she could become addicted quite easily or quickly because during her development in the womb the mother was using. And that is the Court's fears, we do not have all the research on that now, but if you take this child at the age of 13 smoking marijuana versus a child that has never been exposed to marijuana, and the Court is concerned that [the Child] will have a greater chance of becoming addicted immediately.

31. One thing that this Court is considering is the fact that the Court believes the current placement with [the foster parents] would be more mindful of that and would take great precaution in regards to seeking assistance for this child if drugs became an issue in the future.

32. The Court has grave concerns in all of these cases where babies are born addicted or the parent used with them in the womb that we have no idea what is going to happen when they are 10,12,14 and they are exposed to drugs again. It is not going to be for the first time because they have already been

exposed once, when they get exposed again to drugs and how quickly that addiction could kick in for them. The Court hopes and prays that does not happen to [the Child], but this Court is very concerned about that and who would be in the best situation to help address those issues in the future. The Court believes that [the foster parents] would be in a better position to address that in regards to [the great-grandmother].

33. Again, the Court has no doubt that [the great-grandmother] loves this child greatly. But the Court thinks she has got her hands full with the other two children.

34. The Court has to weigh the best interest of this child in looking toward the future.

35. The Court denies the great-grandmother's Petition for custody at this time.

36. The Court finds that the Department has used reasonable efforts to achieve permanency for this child.

37. The current placement is in this child's best interest.

\* \* \*

41. The parents have not made such an adjustment of circumstance or conduct or conditions as to make it safe or in the child's best interest to go home. The Court finds that there is not a lasting impact. The Court does believe that [Mother] is making efforts. The Court always gets concerned in cases like this that this is going to be a setback for [Mother] in her recovery because this is a painful day in her life. And that always causes the Court great concern so the Court hopes she will reach out to Ms. Harmon and the other folks at the Community of Hope to remain steadfast on her road to recovery. This does cause the Court concern. The Court does not want [Mother] to return to using. The Court always tells parents that they can honor their child by not going back to using. The Court does hope the [Mother] is able to make a lasting impact and make a change in her life and the Court does believe she is making progress. The Court is concerned it is going to be a long period of time before the Court can return this child to [Mother].

42.     There is not a relationship between the parents and child because the parents were incarcerated when this child was born and the parents have remained incarcerated after this child's birth and so there is not a bond that has been cultivated.

43.     That the effect of a change of care taker and physical environment is likely to have some type of negative or detrimental effect on the child at this time.

44.     That given the drug use during the pregnancy of the mother and being in the house where methamphetamine was being made three weeks before the child's birth the parents have shown neglect or abuse toward the child.

## Conclusions of Law

1.     From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that the Department has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(g)(4) and T.C.A. § 37-l-102(b)(23)(A), the Respondents [Father] and [Mother] have severely abused [the Child] by the mother ingesting illegal drugs and non-prescribed medication during her pregnancy with this child; the father supplying the mother with non-prescribed medication during the pregnancy with this child and both parents being present in a home where methamphetamine was being manufactured with the risk of explosion.

2.     From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that the Department has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-l-113(g)(1) as defined in 36-l-102(l)(A)(iv), the parental rights of Respondents [Father] and [Mother] to this child should be terminated as both parents were incarcerated at or near the time of filing of the Petition and their actions prior to incarceration have shown a wanton disregard for the welfare of this child.

## Best Interest

1.     From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(l) the Respondents [Father] and [Mother] have failed to make an adjustment of

circumstances, conduct and conditions as to make it safe and in the child's best interests to go home.

2. From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(4) the Respondents [Father] and [Mother] have no meaningful relationship with the child.

3. From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(5), the effect of a change of care taker and physical environment is likely to have some type of negative or detrimental effect on the child at this time.

4. From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(6), the parents have shown neglect or abuse against the child.

5. From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i), the current placement is in this child's best interest.

WHEREFORE, the Court finds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the State has proven by clear and convincing evidence the statutory grounds for termination of parental rights of [Father] and [Mother] to [the Child] pursuant to the provisions of T.C.A. § 36-1-113(g)(4), severe child abuse and T.C.A. § 36-1-113(g)(1), abandonment-wanton disregard. Further, the Court finds that the State has proven by clear and convincing evidence that it is in the best interests of [the Child] that the parental rights of [Father] and [Mother] in and to the child should be terminated pursuant to the provisions of T.C.A. § 36-1-113(g)(4), severe child abuse and T.C.A. § 36-1-113(g)(1), abandonment-wanton disregard.

Father and Mother appeal the termination of their parental rights to the Child to this Court.

**Discussion**

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred in finding and holding that it was in the Child's best interest for Mother's parental rights to be terminated. Father raises two issues on appeal which we restate as: 1) whether the Juvenile Court erred in finding and holding that it was in the Child's best interest for Father's parental rights to be terminated; and, 2) whether the Juvenile Court erred in finding and holding that DCS made reasonable efforts to reunify Father with the Child.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or

guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Although neither Mother nor Father raise an issue regarding the Juvenile Court's finding that grounds existed to terminate their parental rights, given the importance of determining a permanent placement for the Child we will begin by addressing this issue. The Juvenile Court terminated Mother's and Father's parental rights for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv). As pertinent to this ground, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred:

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2013). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

The Juvenile Court made detailed and specific findings with regard to this ground. The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence as discussed more fully above. We need not reiterate each fact which supports the Juvenile Court's findings, but we note that the evidence shows that Mother and Father both were incarcerated at the time of the filing of the petition to terminate their parental rights and that they exhibited a wanton disregard for the welfare of the Child prior to their incarceration. Specifically, the evidence shows that Mother ingested several different illegal drugs during her pregnancy and that Father provided her with a regular supply of some of these illegal drugs. The evidence also shows that Mother and Father both were in a house while meth was being manufactured and that Mother, who was at that time eight months pregnant, then used some of that meth. We find no error in the Juvenile Court's determination that clear and convincing evidence existed to terminate Mother's and Father's parental rights for abandonment by wanton disregard.

The Juvenile Court also found that grounds were proven to terminate Mother's and Father's parental rights for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and Tenn. Code Ann. § 37-1-102. In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

-22-

Tenn. Code Ann. § 36-1-113(g)(4) (Supp. 2013). In pertinent part, Tenn. Code Ann. § 37-1-102 provides:

> (23) "Severe child abuse" means:
>
> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
>
> (C) The commission of any act towards the child prohibited by §§ 39-13-502 – 39-13-504, 39-13-522, 39-15-302, 39-15-402, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or
>
> (D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

Tenn. Code Ann. § 37-1-102 (23) (Supp. 2013).

The evidence in the record on appeal as discussed more fully above does not preponderate against the Juvenile Court's finding that clear and convincing evidence existed to terminate Mother's and Father's parental rights for severe abuse. As discussed above, the evidence shows that in addition to using illegal drugs, which Father provided to her, Mother was present in a house with Father where the act of creating methamphetamine was occurring. We find no error in the Juvenile Court's determination that grounds existed to terminate Mother's and Father's parental rights to the Child for severe abuse.

We turn now to the issue raised by both Mother and Father regarding whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's and

Father's parental rights to be terminated. To begin, we note that although Father raised this issue, Father provided no argument in his brief on appeal with regard to this issue. Instead, Father adopted the brief filed by Mother "as if filed on his own behalf." The brief filed by Mother, however, provides argument related only to Mother's circumstances with regard to this issue, particularly Mother's circumstances since she was released from her incarceration. Mother's brief makes no argument as to Father's circumstances.

Normally, "an issue is waived where it is simply raised without any argument regarding its merits." *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). The Juvenile Court's findings with regard to best interest and our analysis of this issue, however, apply equally to both Mother and Father.

As pertinent to this issue, Tenn. Code Ann. § 36-1-113 provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2013).

The Juvenile Court made detailed and specific findings relative to best interest including:

1.      From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(l) the Respondents [Father] and [Mother] have failed to make an adjustment of circumstances, conduct and conditions as to make it safe and in the child's best interests to go home.

2.      From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(4) the Respondents [Father] and [Mother] have no meaningful relationship with the child.

3.      From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(5), the effect of a change of care taker and physical environment is likely to have some type of negative or detrimental effect on the child at this time.

4.      From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by

clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i)(6), the parents have shown neglect or abuse against the child.

5.      From the exhibits entered into evidence, the testimony of the witnesses, and the record as a whole, the Court finds and so rules that DCS has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i), the current placement is in this child's best interest.

A careful and thorough review of the evidence in the record on appeal, as discussed more fully above, reveals that the evidence does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that it is in the Child's best interest for Mother's and Father's parental rights to be terminated.

Finally, we address whether the Juvenile Court erred in finding and holding that DCS made reasonable efforts to reunify Father with the Child. Mother did not raise or argue this issue on appeal. Pursuant to Tenn. Code Ann. § 37-1-166, DCS must make reasonable efforts "[t]o make it possible for a child to safely return to the child's home," Tenn. Code Ann. § 37-1-166(g)(2)(B) (Supp. 2013), unless:

[A] court of competent jurisdiction has determined that:

(A) The parent has subjected the child that is the subject of the petition or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home to aggravated circumstances as defined in § 36-1-102;

Tenn. Code Ann. § 37-1-166(g)(4)(A) (Supp. 2013). As pertinent to the case now before us, "Aggravated circumstances" are defined in Tenn. Code Ann. § 36-1-102(9) to include "abandonment, . . . or severe child abuse, as defined at § 37-1-102." Tenn. Code Ann. § 36-1-102(9) (2010).

In his brief on appeal, Father states: "Though alleged by the Department in its Petition to Terminate the Parental Rights of the Appellant . . ., no such determination of aggravated circumstances was made thus, the Department was not relieved of its duty to provide reasonable efforts for reunification of parents and child." Father is mistaken as the Juvenile Court did find by clear and convincing evidence the aggravated circumstances of both abandonment by wanton disregard and severe abuse. This determination of aggravated

circumstances, however, was not made prior to the filing by DCS of its petition to terminate Father's parental rights.

In his brief on appeal, Father cites several times to the recent case of *In re: Kaliyah S.*, No. E2013-01352-COA-R3-PT, 2014 Tenn. App. LEXIS 110 (Tenn. Ct. App. Feb. 28, 2014). In *In re: Kaliyah S.*, this Court addressed the issue of whether DCS is required to make reasonable efforts to reunify a parent and child absent a prior order finding aggravated circumstances. *Id*. We note that on June 6, 2014 our Supreme Court granted DCS's Rule 11 petition for application to appeal in *In re: Kaliyah S.*

In the case now before us, however, we need not address whether a prior order finding aggravated circumstances was necessary before DCS was relieved of making reasonable efforts. Instead, we will address whether DCS made reasonable efforts given the circumstances of this case.

In *In re: Giorgianna H.*, this Court explained:

> The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re: Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) (footnote omitted). "[T]he Department's reunification efforts need not be 'herculean,'" and:

> The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody. *State Dep't of Children's Servs. v. B.B.M.*, 2004 WL 2607769, at *7; *In re C.M.M.*, 2004 WL 438326, at *7; *In*

*re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002) (No Tenn. R. App. P. 11 application filed).

*Id*. (footnote omitted).

In the case now before us, the Child was removed, in part, because she was exposed to illegal drugs Father had provided to Mother while Mother was pregnant with the Child. The evidence shows that both Father and Mother were aware that these illegal drugs could harm the baby. The Child also was removed, in part, because Father and Mother, who was eight months pregnant with the Child at the time, were in a house while Father was creating meth, and Father and Mother then used some of that meth. The evidence in the record on appeal reveals the very serious danger the Child was placed in simply by Mother's being present in the house while meth was being created.

Father acknowledged in his brief on appeal that the DCS case manager did visit him in jail "once a month for 5 months," but states that "other efforts to complete parts of the Permanency Plan were thwarted by a variety of reasons including resistence from the officer in charge of the jail." Father argues that the fact that he was incarcerated does not relieve DCS of their "duty to use reasonable care and diligence to provide services to [Father]." Father, however, is using his incarceration as an excuse for his own lack of effort.

The evidence in the record on appeal reveals that Father has refused to acknowledge that he has a serious drug problem. Father testified at trial and denied having any knowledge of there being a meth lab in the house where he was arrested. He also denied having any knowledge of there being the components of meth at the scene. Father also testified that he does not use meth. This testimony given by Father is in direct contradiction to Mother's sworn written statement regarding the day she and Father were arrested and Mother's testimony at trial about the incident and about the fact that she has seen Father use meth. Father's testimony also is directly contradictory to the testimony given by Officer Livingston regarding facts discovered in the investigation which led to Father's arrest. Clearly, Father still is unwilling to acknowledge that he has a serious drug problem. If Father is unwilling to acknowledge and address the problem, then nothing DCS could do would remedy the problem. DCS cannot carry the entire burden of remedying the problems that led to a child being taken into State custody, a parent must make an effort too.

The record also reveals that Father was able to find the money to spend on illegal drugs and cigarettes, but was unable to find the money to spend on the doctor's visits to obtain Suboxone for Mother during her pregnancy. The record is replete with evidence showing that Father considered his own needs and not the needs of his unborn child. DCS cannot make a parent care about his or her child.

Given the severity of the reasons for the Child's removal and all of the circumstances in this case, there were no additional reasonable efforts DCS could have made other than what was done. We find and hold that given all of the circumstances in this case that DCS carried its burden of showing reasonable efforts.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Jessica C.; and one-half against the appellant, Jesse W.


_____
D. MICHAEL SWINEY, JUDGE